**CHICAGO, R. I. & G. RY. CO. v. HANNA.
(No. 11092.)**

(Court of Civil Appeals of Texas. Fort Worth. March 14, 1925. Remittitur filed March 21, 1925. Rehearing Denied April 18, 1925.)

**1. Appeal and error ⟷1040(10)—Overruling exception to allegation that railroad habitually operated trains at high and dangerous rate not prejudicial.**

In action for death at railroad crossing, overruling exception to petition charging that railroad habitually operated trains over crossing in question at high and dangerous rate of speed, held not prejudicial, where at time of accident train was running from 40 to 60 miles an hour, and, according to witnesses, without blowing whistle or ringing bell.

**2. Evidence ⟷474(17)—Opinion testimony of mother as to value of deceased son's services on farm not improper.**

Admission of testimony of deceased's mother as to value of his services on farm, which was admitted without objection as to her qualifications, defendant being allowed full opportunity to cross-examine her in that respect, held not improper, where she testified to facts showing value and character of services.

**3. Appeal and error ⟷215(1)—Exceptions to instructions waived, in absence of objection thereto.**

Exceptions to court's instructions are waived, in absence of any objection thereto.

**4. Death ⟷99(3)—$3,100 not excessive compensation for loss of services of son during minority.**

In action by mother for death at a railroad crossing of 17 year old son, verdict for $3,100 as compensation for loss of services during period between death and time he would have attained majority held not excessive under evidence.

**5. Death ⟷99(3)—$1,900 compensation for loss of services of son after majority excessive.**

In action by mother for death at railroad crossing of 17 year old son, allowance of $1,900 as compensation for loss of services after he would have attained majority held excessive under evidence, to extent of $1,000.

Dunklin, J., dissenting in part on motion for rehearing.

Appeal from District Court, Wise County; F. O. McKinsey, Judge.

Action by Mrs. Mollie Hanna against the Chicago, Rock Island & Gulf Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed on remittitur.

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

⟷For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Lassiter & Harrison, of Fort Worth, and McMurray & Gettys, of Decatur, for appellant.

Will C. Austin, of Fort Worth, and J. V. Patterson, of Decatur, for appellee.

CONNER, C. J. This suit was brought in the district court of Wise county by Mrs. Mollie Hanna against the appellant railway company to recover damages for the death of her son, Vernon Hanna, in a collision between one of appellant's trains and an automobile in which her son was riding, near the town of Chico, Wise county, on July 29, 1920; out of which accident the Steele Case, reported in (Tex. Civ. App.) 264 S. W. 503, and the Dickerson Case, 272 S. W. 543, arose. As appellant now and here states in its brief: "The pleading and evidence in the present case is substantially the same as it was in the Dickerson Case."

We will not in this opinion make a full statement of the circumstances causing the accident, for they are stated in the Steele and Dickerson Cases, to which we refer for that purpose. We will, however, for the sake of clearness, briefly state that the accident occurred at a crossing on appellant's railway line between the towns of Chico and Bridgeport in Wise county. One D. Blocker, accompanied by three other boys, started from the town of Chico to Bridgeport late in the evening of July 29, 1920. A short distance before arriving at the crossing, the road paralleled the appellant's right of way, descending a slope to a lower level, at which point the driver turned his car west along the road which crossed the railway track at right angles. There was testimony to the effect that the train was behind time, running possibly at the rate of 60 miles an hour on a descending grade, and that the boys in the car failed to see or hear the approaching train until within a few feet of the track, when an effort was made to cross ahead of it, but the locomotive struck the back end of the car, severely injuring Steele and killing Dickerson and the son of appellee in this case.

The issues of negligence, tendered by the plaintiffs in the cases referred to, and of contributory negligence tendered by the appellant in this and in the other cases, were sharply contested in the evidence, but on all these issues the jury found in favor of the several plaintiffs, upon evidence which we thought and now think sufficient to support the findings. Indeed, we think the material questions presented in this case, except such as we shall hereinafter discuss, are substantially the same as the questions in the cases discussed and determined, and which for reasons therein given will be overruled without further discussion.

[1] Appellant complains that the court erred in overruling an exception to the plaintiff's petition to the effect that the defendant habitually operated its trains over the crossing in question at a high and dangerous rate of speed, because the allegation was irrelevant and was prejudicial to the defendant before a jury. If it be admitted that the allegation was of an irrelevant nature, it nevertheless can hardly be construed as constituting reversible error. There is scarcely a dispute in the evidence of the fact that on the occasion in question the train was running from 40 to 60 miles an hour, and, according to the testimony of plaintiff's witnesses, without blowing a whistle or ringing a bell for the crossing, and we cannot think that the mere allegation materially prejudiced the case.

[2] Another proposition is that:

"The court erred in admitting the testimony of the plaintiff giving her opinion as to the value of her son's services in working on the farm and managing it, because this was a mere conclusion of the witness, and invaded the province of the jury."

It is ordinarily true that mere opinions of a witness are not admissible, but the rule has many exceptions, as will be seen by a reference to sections 360 and 363, Jones Second Blue Book on Evidence, and notes to those sections. Indeed, appellant in its argument in support of the proposition does not pretend that the rule is not subject to exception. The argument is that the witness was not qualified "to testify as to the reasonable value of the services performed by the deceased," but, there was no such exception to the testimony at the time it was offered, and the witness not only testified to facts tending to show the value and character of her son's services, but appellant had full opportunity to cross-examine her in that respect. So that we think the testimony objected to was fairly within an exception to the rule invoked, and that the jury in possession of the detailed fact was not prejudicially affected by the witness' opinion given in connection with the circumstances.

The material question presented in this case that has not been determined in the other cases referred to arises in appellant's nineteenth, twentieth, and twenty-first propositions, which attack the verdict on the ground that it is excessive. In answer to special issue No. 24, the jury found that the plaintiff had sustained pecuniary loss by being deprived of the services of her son, Vernon Hanna, killed in the accident under consideration, and further found in answer to special issue No. 25 that the value of such services during his minority was $3,100. In answer to special issues Nos. 26 and 27, the jury found that, had plaintiff's son not been killed, plaintiff would receive financial benefit from him after he had attained the age of 21 years in the amount of $1,900. The evidence shows that Vernon Hanna would have been 17 years old in October following his death on July 29, 1920. In connection with

issues 24 and 25; the court gave the following instructions:

"I instruct you that the parents are entitled to the services of a son and the value thereof during his minority. In determining your answer to issue 25, you will estimate the reasonable value of the services of the deceased, if any, of which plaintiff and her husband were deprived by his death, from the date of his death up to the time he would have attained the age of 21 years, and you will deduct therefrom what would have been the cost and expense of his care, support, maintenance, and education during that period, if he had lived, and, if a balance remain, you will deduct therefrom one-half of the net value of deceased's services, if any, that would have accrued between the date of his death and the date of his father's death, and the final balance, if any, should constitute your answer to issue No. 25.

"If you believe and find that the cost and expense of deceased's care, support, maintenance, and education during his minority and after his death would have equaled or exceeded the reasonable value of his services during that period, of which plaintiff and her husband were deprived by his death, you should answer issue No. 24 in the negative."

In connection with issues Nos. 26 and 27, the court gave the following instruction:

"I instruct you that, if you answer issue No. 26 in the affirmative and thereby find that it was reasonably expected that plaintiff would derive financial benefit from the deceased after he had attained the age of 21 years, then you will answer issue No. 27 by determining and stating the sum of money which, if paid now in cash, would reasonably compensate the plaintiff for the loss of such financial benefits, if any."

The evidence of the plaintiff relating to these issues is substantially as follows:

"Vernon would have been 17 years old the 6th day of the following October, just prior to his death. He was putting up hay on the farm. His duties on the farm were to do everything to do on the farm. He cared for the goats, of which we had 300 or something near 300. We had 15 head of mules and horses. He also cared for the cows. He had 50 head of cows. He put in a corn crop.

"Q. Who was the manager of that place? A. He was; him and his father. In putting up this hay, my boy mowed and raked and helped bale or anything; and hauled in the hay. At the time of this accident, we were not living in Chico, but on the farm. When my boy was not engaged in farming, he would do chores around the house; milked, fed, and got wood and water, or anything to do. He was about 6 feet tall and weighed about 140 or 145 pounds. He performed the services on that place that a grown man would perform. My son also worked in the drugstore, sold patent medicines, swept, and brought in water, anything he could do in a store. He worked at the store evenings after school; when he worked in the store, after he finished his labors, he and his father would come home. At night, after his work was performed, my boy would generally be at home. He never loitered around town at night.

"Q. Now, what were your son's services reasonably worth at the time he was working on the farm, managing the farm? A. Four or five dollars a day. Could not have hired—we could not have got this done for that if we could have hired any one. My boy attended school prior to the time he was hurt. He wanted to lead his class. My boy was an obedient boy. He was always obedient and kind. He took an interest in my work. He was always willing and ready to help me do anything that I had to do around the farm."

On cross-examination, plaintiff testified:

"He was going to school. He would have gone to school and finished his education. My girls are well educated. Have given them a good education. At the time of Vernon's death we owned a farm of, I think 750 acres; had 50 or 60 head of cattle, about 300 goats, and 15 or 20 horses and mules. They have about eight months of school term at Chico. He went the whole term, only the year before that he put in a crop with his father, in 1919—a corn crop. He worked that for the family—for the home. The crop was put in for the family. In 1920 he went to school. We, of course, intended to let him finish as well as we could. We were going to send him to Baylor University at Waco. He would have had to have gone there nine months a year for I do not know how many years; about four years after he finished at our school, I think something like that. We intended for him to finish. We decided if he had not been killed we would give him a finished education at Baylor University, nine months a year for four years. * * * The crop season that he had to work would have been just while he was not in school, if we hadn't stopped him like the year before. I did not intend to do that; intended to let him go to school. We would have had to have paid his expenses at Baylor. I had no idea what his expenses would have been at Baylor; something near $1,000 a year, I would think."

On redirect examination she was asked:

"If Vernon had been living in 1921, do you know whether or not you could have sent him to Baylor—been able to send him to school? Would you have been financially able to send him to school in 1921? A. I don't think I would. I have not been financially able to send him to school any time, from 1920 up to date, if he had not been killed in 1920."

On recross-examination she said:

"I intended to send him when he finished the high school. I was intending anyhow to let him go two years longer at Chico. * * * The girls, his sisters, and I would have sent him to school."

On redirect examination she added:

"If we had been able."

On recross-examination she testified as follows:

"Q. You and the girls would have sent him to school if he had wanted to have gone and finished? A. Yes; we would have made an effort to do it.

"Q. You would have made every reasonable

effort? You would have sent him for nine months anyway, until he finished his education? A. Yes."

The plaintiff testified that she was 59 years old, and that her husband was living when the boy was killed, but had died since. That she had another boy 35 years of age, married and living on their farm, but not with her. That she had one daughter living at home, unmarried, who was 31 years old, and another unmarried daughter living at home, who was a school teacher, and another daughter 21 years old, unmarried, and living at home. That at the time of her son's death there was an indebtedness of $2,000 against one tract of their land.

In a consideration of the court's charge, above noted, given in connection with special issues 24 and 25 submitted to the jury, it will be observed that the court, in considering the compensation to be awarded to the plaintiff, instructed the jury, in effect, to ascertain from the evidence the value of the deceased boy's services from the date of his death until his majority, and deduct therefrom a community interest and the cost and expense of his care and support and education during that period, and the remainder should be awarded to the plaintiff. The apparent theory of this instruction is that the wages of the deceased during his minority belonged to the community estate, of which plaintiff alone would be entitled to one-half until the death of the husband, and the whole thereafter, and this seems to have been the theory upon which the plaintiff prosecuted her action. To illustrate, after having alleged the circumstances of the accident, etc., she alleged that because of the negligence charged she had been deprived of her son's services, and—

"has sustained damages as follows, to wit; plaintiff's said son, Vernon Hanna, was at the time of his death 16 years of age, and was capable of doing and was habitually doing manual labor such as done by grown mature men, such as making a crop on the farm and doing other heavy manual labor, and also working and assisting his father in managing a drugstore. He was then receiving for his labor and services $5 per day, aggregating about $125 per month, and, had he lived, he would as he grew older have earned an increased wage which would have averaged at least $2,000 per year from the date of his death until he reached his majority, but for his death said Vernon Hanna would have earned by the time he was of age the sum of $10,000, of which amount this plaintiff would have received and appropriated to their own use the sum of to wit, $7,500 in excess of the amount which would have been used for the benefit of their said son. Plaintiff verily believes and here charges that, if her said son had not been killed as above stated, he would have earned and would have contributed to her support, after he reached the age of 21 years, the further sum of $5,000, and she had a reasonable expectation of receiving at least that amount."

[3] Appellee made no objection to the court's instruction on this point, and hence waives any exception thereto that might have been urged. See G. H. & S. A. Ry. Co. v. Price (Tex. Com. App.) 240 S. W. 524; Texas City Transp. Co. v. Winters (Tex. Com. App.) 222 S. W. 541. Nor has the question of whether the court gave the correct rule for the ascertainment of plaintiff's damages been questioned in this court. We hence will neither discuss nor determine that question, but accept the theory of the case as tried.

[4] So considering the record, we feel unable to say that the verdict and judgment for the sum of $3,100 is excessive compensation for the period between the death of Vernon Hanna and the date when he would have attained his majority had he lived. Appellee testified that her son would have been 17 years old on October 6th following his death on July 29, 1920; that her husband died on the 18th day of April, 1921, 8 months and 19 days after the death of her son. She further testified without qualification that she was sending her son to the local school at Chico, and intended to so do until he completed his course, which would take two more years. Her estimate of the value of his wages per day was from $4 to $5. Adopting the mean between these two sums as the value of his wages, to wit, $4.50 a day, and multiplying the free working days from July 29, 1920, to the date when he would have attained his majority by $4.50, it will be found by a mere mathematical calculation that the result will approximate at least, if not slightly exceed, the sum of $3,100 found by the jury So that, as stated, we cannot say the verdict and judgment in this respect is excessive.

[5] The jury, however, further found $1,900 as compensation for his services after he attained his majority, and appellant insists there is no evidence to support this finding. Appellee testified that she was 59 years old at the time of the trial; that she had a large farm and stock interests to care for and manage; that the son was well developed, kind, and attentive; had more or less experience in the management of the farm; that appellee had but one other son, who was married, living in his own home and caring for his own family; that her other children were girls, unfitted for the rough labor and management involved in the care of the interests referred to. The deceased was the only remaining unmarried son of the family, and it cannot be said from the evidence with certainty that after his majority he would have continued his educational course; or, if he did, that he would not during vacation periods have assisted his mother. Under such circumstances we feel unable to say that the jury were not authorized in concluding that a son of the characteristics shown would not have continued after his majority, to some extent at least, to care for and main-

tain his widowed mother and her interests. In estimating the time he would have so continued and appellee's compensation therefor, under the rule given by the court's charge, is, in the nature of things, not susceptible of an accurate computation. But in view of the fact that after the son attained his majority the value of his services was his own, and that he was under no greater legal obligation to aid and assist his mother in the management of the farm than his brother, and particularly in view of the utter failure of the evidence to show that he himself might not become married and under obligation to provide for and supply a home for a family of his own, we have concluded that the allowance of $1,900 as compensation to plaintiff for the services of her son after his majority is excessive in the amount of $1,000, and for such excess the judgment below must be reversed and the cause remanded, unless appellee shall within 20 days from this date file a remittitur in this court in the said sum of $1,000, in which event the judgment below will be affirmed and here rendered in appellee's favor for the sum of $4,000, the cost of appeal to be taxed against her.

On Motion for Rehearing.

PER CURIAM. Rehearing denied.

DUNKLIN, J. (dissenting in part). Upon further consideration on the motion for rehearing, I do not believe that there was evidence sufficient as a conclusion of law to sustain a finding that the deceased would have continued to make contributions to plaintiff's support after he would have reached the age of his majority had he not been killed. The presumption of law is that such assistance would have ceased upon his attaining his majority, and the burden was on plaintiff to overcome that presumption. As I understand the record, practically the only facts relied on to discharge that burden were that deceased was a boy of good character, of industrious habits, with reasonable prospects to acquire a good education, and a dutiful son. There was no proof that he ever expressed an intention to render such assistance, and evidence renders it doubtful that plaintiff would probably need financial assistance for her support in the future. Moreover, plaintiff had other children from whom probably she had as good reason to expect assistance as from the deceased son. Patterson v. Williams (Tex. Civ. App.) 225 S. W. 89; Hines v. Walker, 225 S. W. 837 (Court of Civil Appeals), writ of error refused by the Supreme Court; G. H. & S. A. Ry. v. Faber, 77 Tex. 153, 8 S. W. 64; T. & P. Ry. Co. v. Shoemaker, 98 Tex. 451, 84 S. W. 1049; Ft. W. Belt Ry. v. Jones, 106 Tex. 345, 166 S. W. 1130; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.